IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BAILEY V. BAILEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AMBER J. BAILEY, APPELLEE,

V.

MICHAEL J. BAILEY, APPELLANT.

Filed November 30, 2021.    No. A-21-105.

Appeal from the District Court for Sarpy County: MICHAEL A. SMITH, Judge. Affirmed in part, affirmed in part as modified, and in part vacated and remanded with directions.

David Pontier, of Koenig | Dunne, P.C., L.L.O., for appellant.

Donald A. Roberts and Justin A. Roberts, of Roberts Law, L.L.C., for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

INTRODUCTION

Michael J. Bailey appeals the order of the district court for Sarpy County that dissolved his marriage to Amber J. Bailey, awarded custody of their minor children, and divided the marital estate. As we explain below, we affirm in part, affirm in part as modified, and in part vacate and remand with directions.

BACKGROUND

Michael and Amber were married in 2003; their older son was born in 2007 and their younger son in 2010. Amber filed a complaint for dissolution of the marriage in October 2019. The district court entered a temporary order in December awarding the parties temporary joint legal and physical custody of the children on a week on, week off parenting time schedule. In the temporary order, the court noted that Amber had raised concerns about Michael's alcohol

consumption, and although at that time the evidence did not show an adverse impact on the children sufficient to limit or supervise his parenting time, the court prohibited Michael from consuming alcohol shortly before or during his parenting time.

Trial was held in October 2020. Amber was working as a registered respiratory therapist, and her schedule at that time required her to work 3 days per week from 6:30 a.m. until 7 p.m. Before entry of the temporary order, she worked every third weekend, but since that time, she has been working every other weekend. So the weeks that the children were with her, she worked 3 weekdays and had weekends off, and the weeks that the children were with Michael, she worked 1 weekday and Saturday and Sunday. She testified that her work schedule will remain the same, in that she will continue to work every other weekend rather than every third weekend.

Amber purchased a home in LaVista, Nebraska, in 2002, prior to her marriage to Michael. The purchase price was $106,000, and the beginning balance of the mortgage was $100,700. After the parties were married, Michael moved into the home, and he and Amber continued to live there until they sold the home in 2009. The sale resulted in proceeds of $17,684.56, which the parties put toward the purchase of the marital home in Bellevue, Nebraska. The closing documents from the purchase of the marital home depict a balance due from Michael and Amber of $4,212.91. Amber testified that she and Michael paid that balance due out of the proceeds of the sale of the LaVista home and used the remainder of the proceeds to finish the basement of the marital home. The parties agreed that the marital home should be sold and the proceeds distributed between them. Amber requested a credit for her premarital funds contributed to the purchase of the marital home in the amount of $10,697.

The parties disagreed on a custody arrangement for their children. Michael requested that they continue with a joint legal and physical custody arrangement utilizing the week on, week off schedule they had followed under the temporary order. He believed that such an arrangement was best because it minimized the number of transitions for the children, and it was easier for them to be in the same place for a week at a time and then switch for the following week.

At the time of trial Michael was working full time as a heavy equipment operator. In the evenings after work, he frequently did concrete jobs on the side, spent time with his friends, played golf, or did other social activities. When the children are with Michael, his mother helps transport them to and from school and watches them in the summer while Michael is working. Michael acknowledged that the children have told him that sometimes they get bored with his mother.

Amber requested sole legal and physical custody of the children. She believed having the children live primarily with her would be in their best interests because of her work schedule. Under the weekly schedule they followed during the pendency of the proceedings, she was home 4 out of the 5 weekdays the children were with Michael, but Michael's mother was caring for them because Michael was working. Amber also preferred that the children spend more time with her because she did not think that Michael was the best influence on them due to his drinking, inappropriate language he frequently uses, and sexist and racist comments he makes.

Amber testified that although she and Michael both worked during the marriage, she was responsible for taking care of most of the children's needs including communicating with their teachers, helping with homework, doing laundry and cleaning, shopping, making doctor's appointments, packing school lunches, setting up playdates, and staying home with them when they were sick. Amber claimed that during the marriage, she was the parent who made most of the

major decisions regarding the children and then told Michael about it after the fact, to which he generally responded, "Okay."

Both children testified in camera, answering questions posed by the judge. At that time, the parties' older son was almost 13 years old, and in 7th grade. He was earning almost all As in school, was on the robotics team, participated in cross-country, and took trumpet lessons. He was asked how the week on, week off schedule was going, and he said it was "okay." He did not like that Michael was living in a small apartment where he and his younger brother have to share a room. He also expressed frustration at the times during Michael's weeks that Michael would be working so Michael's mother would be watching him instead of allowing him to spend that time with Amber. He explained,

> So in the summer we just spend all day with [his grandmother], and it kind of annoyed me a bit 'cause my mom was off work the entire time while I was at my dad's house. And my dad was working. So I was like, why can't I just go spend time with my mom? Like, I like my grandma, but, I mean, she's not my mom. So I kind of like to spend time with my mom.

The older son testified that he likes "almost everything" about Amber's house, including the bigger house where they have a trampoline; his pets, which he cannot have at Michael's apartment; and his friends who live close by. When asked whether he would like to keep following the same weekly schedule, he responded that he would like a little less time with Michael and specified that he did not want to live with Michael half of the time. He explained that he did not like living in an apartment and that he misses his pets and friends when he is at Michael's. He was asked whether his opinion would change if Michael lived in a house instead of an apartment where he had his own room and could have a pet, and he replied, "Maybe a little," but stated that he has always been closer to Amber.

The parties' younger son was 10 years old and in 4th grade at the time of trial. He earns all As in school, plays basketball, takes piano lessons, and likes to read. He, too, was asked about the week on, week off schedule, and he replied, "It's definitely not the best." He testified that it is too much time away from Amber, her house, and their pets; that he misses Amber when he is at Michael's; and that a week is too long to be away from her. He was asked if he misses Michael when he is with Amber, and he answered, "Yeah, a little bit." When asked if there was anything he would change about the current parenting time schedule, he stated that he would prefer less time with Michael and more time with Amber and explained that he just misses Amber and his pets when he is with Michael.

After the conclusion of trial, the district court entered a written decree dissolving the parties' marriage. The court found that during the marriage, Amber undertook the greater share of the more mundane, routine parenting tasks and that Michael worked regular hours but had frequent side jobs, golf leagues, and socializing that occupied his off-work time. The court observed that the children are generally doing well, that they value their time with Michael, but that they miss Amber during their time with Michael. The district court determined that Amber had well-founded concerns regarding Michael's alcohol consumption and the language he uses around the children, especially without her presence or influence and concluded that although some of that behavior had declined since the parties' separation, it was likely that that behavior would continue once litigation had concluded.

- 3 -

Ultimately, the court found that both parties were fit and proper to have custody of the children but that it was in the children's best interests that Amber have sole physical custody. The decree included conflicting findings regarding legal custody of the children, which we address below. Michael was awarded parenting time every other weekend from Friday at 5 p.m. until Sunday at 6 p.m. and one evening every week from 5 p.m. until 9 p.m. Michael's weekend parenting time was to coincide with the weekends that Amber was working. The parenting plan also divided holidays between the parties.

In the decree, the district court observed that the parties agreed that the marital home should be sold and the proceeds distributed between them. It concluded that Amber had made a contribution to the purchase of the marital home of $10,697 out of the proceeds from the sale of the LaVista home, and it therefore awarded her a credit in that amount for her contribution of premarital property. Overall, after valuing and dividing the marital estate, Amber was ordered to make an equalization payment to Michael of $3,312.13.

Michael was ordered to pay child support of $575 per month. The decree provides that each party shall pay 50 percent of all daycare expenses incurred on behalf of the children in order for Amber to maintain gainful employment or obtain education to enhance her earning capacity. The district court also required that Michael maintain a life insurance policy currently in place on his life and name the minor children as irrevocable beneficiaries until he no longer has a child support obligation. Michael was also ordered to pay attorney fees for Amber of $5,000. Michael appeals.

## ASSIGNMENTS OF ERROR

Michael assigns that the district court erred in (1) its award of legal custody, (2) awarding sole physical custody to Amber and reducing his parenting time to two overnights every other weekend, (3) ordering his parenting time to be conditioned upon Amber's work schedule, (4) awarding routine and holiday parenting time without specifying days of the week, dates, and times, (5) ordering him to secure his child support obligation with his life insurance policy, (6) ordering only Amber's employment and education-related childcare costs to be divided between the parties, (7) awarding Amber a $10,697 premarital credit for a portion of the equity in the marital residence, and (8) awarding Amber $5,000 in attorney fees.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id*. However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

ANALYSIS

*Custody.*

Michael raises two issues with regard to custody, one relating to legal custody and one relating to physical custody. He first argues that the district court erred in awarding Amber sole legal custody or joint legal custody with final decisionmaking authority. Because the decree is unclear on its award of legal custody, we remand that issue for clarification.

The decree refers to legal custody several times. At one point, after making certain factual findings, it states, "The [c]ourt finds that [Amber] shall be awarded sole legal and physical custody." Later, the decree provides that "it is in the children's best interests that the parties have joint legal custody." Finally, the decree states that "the parties are awarded joint legal custody of the minor children . . . but if there is a disagreement between the parties on a major issue, [Amber] shall have the final decision making power." Given the conflict in the foregoing language, we conclude that the decree is unclear as to its award of legal custody. We therefore vacate any provisions relating to legal custody and remand the cause to the district court for clarification as to what form of legal custody it intended to award.

With respect to physical custody, Michael asserts that the district court erred in awarding sole physical custody to Amber, arguing that instead, it should have continued the joint physical custody arrangement contained in the temporary order. We find no abuse of discretion in the court's decision as to physical custody.

When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016); Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2020). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Burcham v. Burcham, supra*. Because the district court found that Michael and Amber were both fit parents, a finding that Michael does not challenge, we consider the children's best interests.

The best interests of a child require a parenting arrangement "for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). The best interests of a child also require that

> the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

§ 43-2923(3). Section 43-2923(6) further provides:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member[;] and

(e) Credible evidence of child abuse or neglect or domestic partner abuse.

Here, Michael points out that when determining whether custody of a minor child should be modified, the evidence of the custodial parent's behavior during the year or so before the hearing on the complaint to modify is considered most significant. See, e.g., *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). He requests that we extend this standard, which he refers to as the "one-year rule," to original dissolution of marriage actions, such that it encompasses all custody decisions. While we agree that parents' behavior in the year leading up to trial is highly relevant to a determination of an appropriate physical custody arrangement, we decline to adopt such a specific rule when assessing the best interests of the child for purposes of an original custody determination.

In the present case, the evidence does not lead us to conclude that the district court's decision was an abuse of discretion. We agree that the evidence shows that Michael abstained from consuming alcohol during his parenting time as required under the temporary order. We also recognize, however, that Amber claimed that during the pendency of the temporary order, Michael had been "playing the parenting part quite well" but that she did not think he could continue and was concerned that he would go back to what he was doing before. She claimed that he drank alcohol every day during the marriage and when he would drink he would "get loud" and yell or curse at her and the children. Her concerns extended beyond drinking to include the way Michael talked around the children, in particular the way he talked about and to women, and she expressed concerns about inappropriate language he would frequently use and sexist and racist comments he would make.

The district court found Amber's testimony in this regard to be credible when it determined that she raised well-founded concerns regarding Michael's alcohol consumption and the language he uses around the children, especially without Amber's presence or influence, and when it concluded that although some of that behavior had declined since the parties separated, it was likely that it would continue once litigation had concluded. As to these factual findings, we consider and give weight to the fact that the district court heard and observed the witnesses and accepted one version of the facts rather than another. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

Moreover, the court based its physical custody decision on factors beyond Michael's behavior. It found that although the parties shared parenting duties during the marriage, Amber had undertaken the greater share of mundane, routine parenting tasks throughout the children's lives. And although both parties worked full-time, Amber's schedule left her greater availability to care for the children, not only due to her work schedule but because Michael filled his off-work time with other activities.

The district court observed that the children are doing well and value their time with Michael, but that they both miss Amber during the times they are with Michael. Both Amber and

the parties' older son expressed a desire for the children to be with Amber, rather than their paternal grandmother, when Michael was working and Amber was not. In general, both children wanted to spend more time with Amber and less time with Michael. Both children were of sufficient age and maturity for their preferences to be considered alongside other factors. See, § 43-2923(6)(b); *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020); *Donscheski v. Donscheski*, 17 Neb. App. 807, 771 N.W.2d 213 (2009). Keeping in mind that a judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition, we cannot find that the district court's decision to award sole physical custody to Amber was an abuse of discretion.

We note that to support his arguments on this issue, Michael also directs our attention to *Schieffer v. Schieffer*, No. A-18-1090, 2020 WL 2845774 (Neb. App. June 2, 2020) (selected for posting to court website). Michael's citation to *Schieffer* violates Neb. Ct. R. App. P. § 2-102(E)(4) (rev. 2021), which currently states that opinions not designated for permanent publication "may be cited only when such case is related, by identity between the parties or the causes of action, to the case then before the court." *Schieffer* and the present case are not related by identity between the parties or the causes of action. Therefore, we have addressed his arguments without reference to *Schieffer v. Schieffer, supra*.

*Parenting Time.*

Michael assigns two errors related to parenting time. He first argues that the district court erred in ordering that his parenting time be conditioned upon Amber's work schedule, which he claims is an improper delegation of judicial authority. He also claims that the court erred in failing to specify days, dates, and times for routine and holiday parenting time as required under the Nebraska Parenting Act.

We disagree with Michael's assertion that the district court improperly delegated its judicial authority when it conditioned his parenting time upon Amber's work schedule. Under Nebraska law, the court is responsible for developing and approving a parenting plan. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). A trial court has a nondelegable duty to determine questions of custody and parenting time of minor children according to their best interests. *Id*. The authority to determine custody and visitation cannot be delegated to a third party, because it is a judicial function. *Id*.

In *VanSkiver v. VanSkiver, supra*, the Nebraska Supreme Court found no improper delegation of judicial authority in a parenting plan that awarded parenting time to the father on two evenings per week but allowed the children to decline to go on those visits if their father acted in a threatening manner. In reaching its decision, the Supreme Court acknowledged that the parenting plan provided that the children could decide if they wanted to see their father and could decline to go on the weekly visits, but the Supreme Court did not construe this language to be delegating to the children the judicial duty of establishing the parenting schedule when the children were not given discretion to set the parenting time schedule, nor were they given authority to determine whether or when their father could exercise parenting time.

Similarly here, Amber was not given the discretion to set Michael's parenting time. The district court's order sets forth the days and times that the children are to spend with each parent. And it awarded Michael parenting time every other weekend, specifying that his weekend time

coincide with the weekend that Amber works. Amber was not delegated the authority to alter Michael's parenting time, nor is there any indication in the parenting plan that she could unilaterally change his parenting time in the event her work schedule changes. We therefore find that the language of the parenting plan does not improperly delegate the court's authority to establish a parenting schedule.

We next consider whether the court's failure to specify dates and times for routine and holiday parenting time was an abuse of discretion. Under the Nebraska Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2020), a parenting plan shall include:

> Apportionment of parenting time, visitation, or other access for each child, including, but not limited to, specified religious and secular holidays, birthdays, Mother's Day, Father's Day, school and family vacations, and other special occasions, specifying dates and times for the same, or a formula or method for determining such a schedule in sufficient detail that, if necessary, the schedule can be enforced in subsequent proceedings by the court . . . .

§ 43-2929(1)(b)(ii). This statute does not require that dates and times for all parenting time be specified; rather, it is permissible that the schedule be sufficiently detailed such that it can be enforced in a later proceeding.

In this case, with respect to routine parenting time, the court awarded Michael, in addition to his alternating weekend time, one evening every week from 5 p.m. to 9 p.m. It did not specify a particular day of the week. We do not find this lack of detail to be an abuse of discretion. The children were 10 and 12 years old at the time of trial and already involved in school and extra-curricular activities. The flexibility built in to the parenting plan will allow the parties to identify an evening where both children will be available in order to spend time with Michael; yet this provision is sufficiently detailed such that it could be enforced in the future, if necessary.

We reach a different conclusion as to the holiday parenting time. Although the district court divided holidays between the parties, it did not specify exact dates and times or an alternative method for determining such a schedule. Rather, it merely identified the holidays, such as "Christmas," without further detailing whether that included Christmas Eve or encompassed the school holiday break. We therefore remand the cause to the district court for further specification of dates and times for the holiday parenting time allotted in the parenting plan.

*Child Support.*

Michael raises two issues related to the district court's child support calculation. He first asserts that the district court erred in requiring him to secure his child support obligation with his life insurance policy. We agree.

A court has discretion to require reasonable security for an obligor's current or delinquent support obligations when compelling circumstances require it. *Davis v. Davis*, 275 Neb. 944, 750 N.W.2d 696 (2008). See Neb. Rev. Stat. § 42-371(7) (Reissue 2016) ("[t]he court may in any case, upon application or its own motion, after notice and hearing, order a person required to make payments to post sufficient security, bond, or other guarantee with the clerk to insure payment of both current and any delinquent amounts"). However, an order requiring security to be given is a somewhat extraordinary and drastic remedy, and such order should only be invoked when compelling circumstances require it. *Klinginsmith v. Wichmann*, 252 Neb. 889, 567 N.W.2d 172

(1997), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010). See also *Lacey v. Lacey*, 215 Neb. 162, 337 N.W.2d 740 (1983). An appellate court reviews an order regarding security for a support obligation de novo on the record for an abuse of discretion. *Davis v. Davis, supra*.

In the present case, our de novo review of the record does not reveal compelling circumstances that would require security for Michael's child support obligation. Under the temporary order, Amber was ordered to pay child support to Michael, so there is no evidence of failure to pay or an arrearage on Michael's part. Michael is gainfully employed both full time as a heavy equipment operator and doing concrete work on the side. According to the district court's child support calculations, Michael's gross monthly income is $4,729, just slightly less than Amber's monthly income. The record does not indicate that Michael is heavily in debt or spends money lavishly. Accordingly, we conclude that because the record does not evince any compelling circumstances that would require security for Michael's child support obligation, the district court abused its discretion in ordering Michael to maintain his life insurance policy and name the minor children as beneficiaries. We therefore modify the decree to strike that requirement.

Michael additionally claims that the court erred in ordering only Amber's employment and education-related childcare costs be divided between the parties. Under the Nebraska Child Support Guidelines:

> Care expenses for the child for whom the support is being set, which are due to employment of either parent or to allow the parent to obtain training or education necessary to obtain a job or enhance earning potential, shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution (worksheet 1, line 6) and shall be added to the basic support obligation computed under these guidelines.

Neb. Ct. R. § 4-214 (rev. 2016).

The Supreme Court has recognized that this rule provides for allocation of childcare expenses "due to either parent's employment or education." *Anderson v. Anderson*, 290 Neb. 530, 540, 861 N.W.2d 113, 122 (2015). Here, the district court ordered that each party pay 50 percent "of all daycare and preschool expenses incurred on behalf of [the] minor children in order for [Amber] to maintain gainful employment or obtain education to enhance her earning capacity." The failure to also divide expenses related to Michael's employment or education was contrary to § 4-214, and thus, it was an abuse of discretion. Accordingly, we modify the decree to allocate to each party 50 percent of all childcare expenses due to the employment or education of either Amber or Michael.

*Credit for Premarital Property.*

Michael assigns that the district court erred in awarding Amber a credit of $10,697 for premarital funds related to the home she purchased prior to the marriage. We find no error in the decision to award Amber a credit for premarital property; however, we find that the amount the district court awarded is erroneous and modify it as detailed below.

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). The first step is to

classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id*.

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id*. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id*. Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id*. If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id*. The burden of proof rests with the party claiming that property is nonmarital. *Id*.

In the present case, the district court awarded Amber a credit of $10,697 related to the LaVista home she purchased prior to the marriage. This figure appears to be based on the fax cover sheet for the closing documents from the title company at the time Amber purchased the LaVista home. The cover sheet indicates that Amber had already obtained a cashier's check for $9,000 and that the title company would have a check for her at the time of closing in the amount of $1,697.92. We understand that Amber arrived at a credit amount of $10,697 by adding the figures from the cover sheet together. Rather than adding these figures together to equal the total down payment Amber made toward the purchase of the LaVista home, however, the closing documents indicate that the total amount due from Amber was $7,302.08, and therefore, because she had already obtained a cashier's check for $9,000, the title company was to reimburse her the difference of $1,697.92. Thus, Amber was not entitled to a credit for nonmarital property of $10,697.

Nevertheless, it is undisputed that Amber purchased the LaVista home prior to her marriage to Michael; thus, the down payment she made at the time of purchase was made using nonmarital funds. She also made the mortgage payments for just over a year using her nonmarital funds. The record does not specify the balance of the mortgage at the time of the parties' marriage. It does, however, establish that the LaVista home was sold in 2009 resulting in proceeds of $17,684.56, which were put into the marital residence, partially as a down payment and partially to finish the basement. The question is how much of the proceeds from the sale of the LaVista home were nonmarital. Without any evidence as to the balance of the mortgage at the time of the marriage, we are unable to discern the total amount of premarital equity Amber had in the home. Despite this, the evidence does establish that the purchase price of the LaVista home was $106,000 and that the balance of the mortgage at that time was $100,700. Thus, the total equity that Amber had in the LaVista home at the time of purchase equals the difference of those figures, or $5,300. Amber conceded at trial that that was the total equity in the home at the time of purchase. We therefore conclude that Amber established that she had at least $5,300 in equity in the LaVista home at the time of the marriage.

Both parties agreed that the down payment for the marital home was paid out of the proceeds from the sale of the LaVista home. And Amber testified that she and Michael used the rest of the sale proceeds to finish the basement of the marital home. A spouse's own testimony can

establish a tracing link, i.e., tracking an asset to a nonmarital source. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). As a result, we find that Amber met her burden of proving that she had nonmarital assets of $5,300 that can be traced from the purchase of the LaVista home to the marital home. Accordingly, we modify the credit awarded to Amber in the decree to reflect her premarital interest of $5,300. We must also therefore increase the equalization payment that is due from Amber to Michael from $3,312.13 to $8,709.13.

*Attorney Fees.*

Finally, Michael assigns that the district court erred in awarding Amber $5,000 in attorney fees. We find no abuse of discretion in this decision.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). Attorney fees shall be awarded against a party who alleged a claim or defense that the court determined was frivolous, interposed any part of the action solely for delay or harassment, or unnecessarily expanded the proceeding by other improper conduct. *Id*. Additionally, in dissolution cases, as a matter of custom, attorney fees and costs are awarded to prevailing parties. *Id*. Finally, a uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id*.

In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Id*. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id*.

Here, Amber presented an affidavit by her attorney detailing attorney fees and costs related to this dissolution matter totaling $16,324.32. The parties generally agreed on the division of the marital estate; so the disputed issues at trial focused on custody of the children, child support, and whether and to what extent Amber was entitled to a premarital credit related to the LaVista home. On these issues, Amber was generally the prevailing party, having been awarded sole physical custody, child support, and a credit for her premarital funds. On these facts, we find no abuse of discretion in the award of $5,000 in attorney fees.

CONCLUSION

We affirm in part, affirm in part as modified, and in part vacate and remand the cause with directions. Specifically and in the order we addressed the issues above, we vacate any language related to legal custody and remand to the district court for clarification; affirm the award of sole physical custody to Amber; affirm the language of the parenting plan specifying that Michael's weekend time coincide with Amber's work schedule and awarding Michael one evening every week without further detail; remand for further specification of holiday parenting time; modify the decree to strike the requirement that Michael maintain life insurance to secure his child support obligation; modify the decree to allocate childcare expenses as to both parties; affirm the award of a credit to Amber for her premarital property but modify the amount to $5,300 and modify the

amount of the equalization payment from Amber to Michael to $8,709.13; and affirm the award of attorney fees to Amber.

AFFIRMED IN PART, AFFIRMED IN PART AS MODIFIED, AND IN PART VACATED AND REMANDED WITH DIRECTIONS.